IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LESLEY RICHARDSON :
: CIVIL ACTION
v. : No. 11-7688
:
UNITED FINANCIAL CASUALTY :
COMPANY :
:

O'NEILL, J. May 30, 2013

## MEMORANDUM

Plaintiff Lesley Richardson claims that defendant United Financial Casualty Company acted in bad faith in its handling of her claim for underinsured motorist benefits after she was involved in a motor vehicle accident on October 18, 2006. Defendant now moves for summary judgment. For the reasons that follow, I will grant defendant's motion.

## BACKGROUND

On October 18, 2006, plaintiff was involved in a motor vehicle accident. Dkt. No. 10 at ¶ 1. Plaintiff testified that her vehicle was pushed forward in the accident "such that she had to jam on the brakes to stop it, and that her chest struck the steering wheel and that the back of her head struck the headrest after he[r] seatbelt locked up as a result of the collision." Dkt. No. 12 at ¶ 15. The police report for the accident noted no damage to her vehicle. Dkt. No. 10 at ¶ 2.

At the time of the accident, plaintiff was operating a 2005 Toyota Corolla owned by VNA Community Services, Inc. Id. at ¶ 1. Defendant insured the Corolla pursuant to an automobile insurance policy it issued to VNA (policy number 04123570-3). Id. at ¶ 3. The policy provided up to $1,000,000 in underinsured motorist coverage, subject to the terms and conditions of the policy, for damages an insured would be "entitled to recover from the [at-fault driver] of an underinsured auto because of bodily injury." Id. at ¶¶ 4, 5. In the event that an

insured and defendant could not agree on the amount of damages sustained by the insured, the Policy provided that the amount would be "determined by arbitration." Id. at ¶ 7.

Plaintiff submitted a UIM claim to defendant through her UIM counsel, Joseph DeSimone, in a November 29, 2007 letter to defendant. Id. at ¶ 10. On December 4, 2007, Progressive opened and assigned the UIM claim to claims representative Christine Friel. Id. at ¶ 11. At the time, Friel had more than 25 years of experience in the insurance industry. Id. at ¶ 12. Friel determined that the other driver was at fault for the accident in which the Corolla sustained no damage. Id. at ¶ 13.

On December 4, 2007, DeSimone informed Friel that the at-fault driver had $50,000 in liability insurance coverage through Allstate Insurance Company, see id. at ¶ 17, meaning that plaintiff would be entitled to underinsured motorist benefits from defendant only if the value of her injury claim exceeded $50,000.

By January 14, 2008, plaintiff provided Friel with documentation that she had received treatment from fifteen medical providers and that she had combined lost wages and medical expenses in excess of $57,267.70. Dkt. No. 12 at ¶ 4. On February 6, 2008, Friel evaluated the medical records plaintiff had submitted. Dkt. No. 10 at ¶ 19. Friel noted that plaintiff was limited to working light duty at the time of the October 18, 2006 motor vehicle accident because of chronic back pain.[1] Id. at ¶ 26. Friel also remarked that plaintiff's medical records documented a history of chronic pain prior to the accident. Id. at ¶ 21; see also Dkt. No. 14 at ¶ 21. She documented plaintiff's alleged injuries as including "cervical strain and sprain – lumbar strain and sprain – aggravation of pre-existing [herniated nucleus pulposus ("HNP")] at

---

[1] Plaintiff notes that, although she was working light duty at the time of the accident, she was working full time. Dkt. No. 14 at ¶ 26.

L5-S1 – L5-S1 right microdiscectomy," Dkt. No. 10 at ¶ 20, and aggravation of chronic pain syndrome. Dkt. No. 14 at ¶ 20. Friel noted that four months before the accident, in June 2006, plaintiff had an MRI of her lumbar spine and that a post-accident MRI of plaintiff's lumbar spine showed that the "herniated disc was unchanged." Dkt. No. 10 at ¶ 22. The June 2006 MRI report documented an "L5-S1 right paracentral disc herniation in contact with the S1 nerve root" and a "mild disc bulge, L4-5." Id. at ¶¶ 23-24. The November 2006 post-accident MRI documented "no change in the appearance of the disc herniation at the L5-S1 level on the right." Id. at ¶ 25.

On October 30, 2006, Dr. Randy Robinson had written that "while [plaintiff] had [ ] been doing well with interventional therapy for management of her chronic lumbar radiculopathy [prior to the accident, since then she] has been having increasing lumbar radiculopathic symptoms and low back pain spasm with an addition of cervical spasm." Dkt. No. 12-17 at ECF p. 2. In a November 6, 2006 report, Dr. Richard A. Goldberg wrote that plaintiff "had several epidural steroid injections [after] June 2006 and did not need surgical intervention" at that point in time. Dkt. No. 12-18 at ECF p. 3. A November 17, 2006 report from Dr. Guy A. Lee stated that plaintiff had gotten "rid of most of her pain and was doing well" prior to the motor vehicle accident. Dkt. No. 12-19 at ECF p. 2. Lee also wrote that plaintiff "already had three to four epidurals prior to the accident" and was "not able to get any more." Id. Plaintiff ultimately had back surgery on December 7, 2006, approximately 7 weeks after the motor vehicle accident. Dkt. No. 12 at ¶ 30.

After her February 6, 2008 review of plaintiff's medical records, Friel noted that she had a question regarding "whether [plaintiff's] disc surgery is related to the motor vehicle accident. I accept temporary aggravation of the pre-existing HNP at L5-S1." Dkt. No. 10 at ¶ 27. To

3

further investigate whether plaintiff's surgery and resulting complaints were caused by the accident, Friel planned to obtain all of plaintiff's pre- and post-accident medical records. Id. at ¶ 28.

On February 7, 2008, Friel's supervisor Brian Haeflein, Senior Claims Manager, who manages the Pennsylvania Large Loss Unit for defendant and other Progressive entities, noted that "there are causation arguments as insured was diagnosed with HNP prior to loss and there also seems to be a recommendation for surgery prior to our loss as well. Need to determine if surgery will be related to our accident, agree with Christine's plan to get info listed." Id. at ¶¶ 30, 31.

On March 5, 2008, Friel reviewed additional medical records received from plaintiff's UIM counsel. Id. at ¶ 33. A June 22, 2006 report from Dr. Guy Lee stated that plaintiff's "leg pain with a disc herniation is potentially surgical and most likely would involve a right L5-S1 microdiskectomy if conservative management fails and she has leg pain that she cannot tolerate." Id. at ¶ 34. A report from an August 11, 2006 lumbar epidural injection noted a lumbar nerve root block at L4 on the right, L5 on the left and S1 on the right on August 11, 2006. Id. at ¶ 35. On September 1, 2006, plaintiff underwent another lumbar nerve root block at L4 on the right, L5 on the left and S1 on the right. Id. at ¶ 36. On September 26, 2006, plaintiff underwent a lumbar injection at L2 on the right, L3 on the right, L4 on the right, L5 on the right and at the sacral ala on the right. Id. at ¶ 37. After Friel's review of these records, she again noted a "question whether [Plaintiff's] surgery is in fact related to the [accident] and will likely require an [independent medical examination] once I get the employment records." Id. at ¶ 38 (alterations in original). Later, when plaintiff gave her statement under oath, she testified that "[t]he first injection really didn't do anything. I mean, I felt the difference by – well, by the

4

second one and to the – to the last one. I had a big improvement by the – I'd say by the third one it was a real big improvement." Dkt. No. 12-13 at 33:17-22.

On May 14, 2008, Friel noted in her claims entry log that she still had not received plaintiff's employment records. Dkt. No. 16 at Richardson 1039. She noted that plaintiff's UIM counsel said he had "not had an opportunity to review them and send them out as his trial schedule has been busy" but that he expected to get the information to her in a week to ten days. Id. She noted that she would "likely need a records review from a neurosurgeon to address" whether plaintiff's pre-existing back condition had been "stable at the time of" the accident. Id.

On June 25, 2008, Friel noted that plaintiff's UIM counsel was "still not cooperative in providing [her with] his client's employment records as requested." Id. at Richardson 1038. On December 11, 2008, Friel noted that the paralegal for plaintiff's UIM counsel "confirmed that they have all of the insured's work records but unfortunately the [attorney] has been in trial and has been unable to review them . . . ." Id. at Richardson 1036-37.

Plaintiff's UIM counsel provided Friel with plaintiff's employment records on or around December 17, 2008. Dkt. No. 10 at ¶ 40; see also Dkt No. 16 at Richardson 1036. The records confirmed that, although she was working full time, plaintiff was limited to working in a light duty capacity immediately prior to and at the time of the October 18, 2006 motor vehicle accident. Dkt. No. 10 at ¶¶ 41, 43.

Plaintiff's UIM counsel provided Friel with updated medical records in February, March and April 2009 and with worker's compensation lien information and medical cost projections in May and June 2009. Id. at ¶¶ 44, 46. Friel documented that plaintiff's worker's compensation lien was in the amount of approximately $63,000 and her projected future medical expenses were in the amount of $680,053.37. Id. at ¶¶ 45, 47.

5

Friel completed an evaluation of plaintiff's claim on June 17, 2009, concluding that plaintiff was not "underinsured" because Friel evaluated the value of the injuries caused by the October 2006 accident as falling within the tortfeasor's $50,000 policy limit. Id. at ¶ 48. Friel wrote:

> At this point I do not believe that we have sufficient information to show that this minor impact [accident] was the cause of the insured's disc surgery and ongoing problems. We know she had prior [disc herniation] and post-[accident] MRI scans show that the disc was not worse but the same. We also know that she had severe complaints of back pain with radiculopathy prior to the [accident] and had a series of epidural injections prior to [the accident] the last being just three weeks prior to [the accident]. Also, we know that her doctor said she will likely need surgery. At this point I do not believe that we have sufficient information to suggest this minor [accident] pushed her preexisting condition into surgery. The attorney claims she was pain free at the time of this [accident] but the records do not reflect this. She was already on light duty at the time of this [accident] due to her preexisting condition and when the EMS [personnel] interviewed her at the accident scene she said she had chronic low back problems since early 2006.

Id. at ¶ 50 (alterations in original). Based on her conclusion, Friel requested authority to settle the claim for an amount up to $7,150 based upon "cost of defense." Id. at ¶ 51.

Friel contacted Plaintiff's UIM counsel on June 19, 2009 and offered $5,000 to settle plaintiff's claim. Id. at ¶ 52. Plaintiff's UIM counsel testified that he advised Friel "that he viewed the case as a policy limits case, but that Plaintiff [would be] willing to settle within the policy limits in the range of the $680,000 lifecare plan that counsel provided to Ms. Friel at that time." Dkt. No. 14 at ¶ 73. Friel informed him that she had questions regarding plaintiff's claim because it involved a low impact accident resulting in minor damage to the involved vehicles, plaintiff was not pain-free at the time of the accident, plaintiff had received an epidural injection to the lumbar spine three weeks prior to the accident and plaintiff was a candidate for surgery at

6

the time of the accident. Dkt. No. 10 at ¶ 54. Friel also told plaintiff's UIM counsel that she would need plaintiff's statement under oath, her prior medical records and films and an IME and film review. Id. at ¶ 55.

On June 23, 2009, plaintiff's UIM counsel demanded arbitration of her claim. Id. at ¶ 56. Plaintiff conducted her statement under oath in October 2009. Id. at ¶ 58. Thereafter, defendant sought to secure medical records that plaintiff identified during her statement under oath. Id. at ¶ 59. Defendant continued to obtain plaintiff's medical records through April 2010. Id. at ¶ 64.

On January 21, 2010, Friel spoke with a representative of Allstate, the at-fault driver's liability insurer. Id. at ¶ 60. Allstate's representative informed Friel that Allstate would tender its $50,000 liability policy limit to plaintiff due to the amount of her workers' compensation lien. Id. at ¶ 62. Friel reported that Allstate's representative had also told her that the doctor who had reviewed plaintiff's medical films at Allstate's request had concluded that plaintiff's disc bulge at L4-5 was degenerative in nature and not related to the accident and that plaintiff's herniation at L5-S1 was unchanged after the accident. Id. at ¶ 61.

On January 26, 2010, Friel obtained photos of the vehicles involved in the accident for the first time. Dkt. No. 12 at ¶ 13. The photos were not produced to plaintiff in advance of the arbitration hearing. Id. at ¶ 14.

On April 28, 2010, plaintiff advised defendant that her workers' compensation carrier possessed a lien in the amount of $114,035.40 for medical and wage loss benefits paid to her or on her behalf as a result of the subject motor vehicle accident. Dkt. No. 12 at ¶ 8.

On May 10, 2010, Dr. Marc Manzione issued a report of his April 27, 2010 IME of plaintiff. Dkt. No. 10 at ¶ 65; see also Dkt. No. 12 at ¶ 17. He opined that

7

> it is clear from the clinical records as well as from the objective testing performed that the October 18, 2006 accident resulted in soft-tissue injuries to the neck and lower back. The injury to the lower back was sustained in the presence of an L5-S1 disk herniation . . . . It is clear that no anatomic change occurred as a result of the October 18, 2006 accident . . . . The surgery performed by Dr. Lee was necessitated by disk pathology which predated the motor vehicle accident. The motor vehicle accident affected only the timing of this procedure. This patient's disk herniation was not cured by the pre-accident lower back injections. The disk herniation which necessitated the surgery was not caused by or permanently affected by the October 18, 2006 motor vehicle accident.

Dkt. No. 10 at ¶ 66. He further noted that plaintiff's residual symptoms were "unrelated to any injury which might have been sustained on October 18, 2006." Id. at ¶ 67.

On June 2, 2010, Friel concluded that

> based on the reports and our IME, I am not accepting lumbar surgery and the implant of the stimulator as being accident-related. I believe that this minor low impact collision may have exacerbated her pre-existing condition, but that she was likely back to baseline within a few months. Given that the evidence shows that herniation was pre-existing and Dr. Manzione says the accident did not push her into surgery, we would not be responsible for the workman's compensation lien. I believe my original evaluation is presently in line and I believe the case is likely headed to arbitration.

Id. at ¶ 68. Also on June 2, 2010, Friel's supervisor, Laurie Pellicore, reviewed her analysis and agreed with her conclusions. Id. at ¶ 69.

On June 18, 2010, Friel contacted plaintiff's UIM counsel to discuss plaintiff's UIM claim. Id. at ¶ 71. It appeared that the parties would be unlikely to resolve plaintiff's claim with a settlement. Id.; Dkt. No. 14 at ¶ 72. On June 24, 2010, plaintiff made her first settlement demand in a voicemail message from her UIM counsel to Friel, offering to settle with defendant for $500,000. Dkt. No. 12 at ¶ 9; see also Dkt. No. 10 at ¶¶ 73, 74. Defendant did not respond to the voicemail message. Dkt. No. 12 at ¶ 10.

8

On July 12, 2010, Dr. Manzione issued a supplemental report following his review of plaintiff's MRI films in which he confirmed that his original opinion remained unchanged – no anatomic change occurred as a result of the accident. Dkt. No. 10 at ¶ 76.

Plaintiff's UIM claim went to arbitration on July 13, 2010.[2] Dkt. No. 10 at ¶ 77. On July 29, 2010, the arbitration panel found that plaintiff's damages amounted to $675,000 and awarded her $625,000 after molding the award to reflect a credit to defendant in the amount of the third-party tortfeasor's $50,000 policy limit. Dkt. No. 14 at ¶ 80; Dkt. No. 10 at ¶ 80; Dkt. No. 12-12. Defendant issued a draft to plaintiff in the amount of $625,000 on or about August 30, 2010. Dkt. No 10 at ¶ 81.

**STANDARD OF REVIEW**

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

---

[2] The arbitration hearing had originally been scheduled for May 20, 2010, but was continued at defendant's request because it had not obtained all of plaintiff's medical records in time for the hearing. Dkt. No. 12 at ¶ 19.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

Plaintiff's complaint asserts that "Defendant's decision to refuse to settle Plaintiff's UIM claim and never offer any settlement above $5,000 was unreasonable, made in bad faith, and showed a reckless disregard for the Defendant's contractual obligations and duties of good faith and fair dealing." Compl. at ¶ 34. Defendant contends that it is entitled to summary judgment on plaintiff's bad faith claim because

> [t]he objective and undisputed history of Plaintiff's back injury, diagnosis, treatment, and the independent medical examination established that there was a reasonable dispute about the value of Plaintiff's UIM claim and a reasonable basis to defend the UIM claim at arbitration because there was substantial and compelling evidence that Plaintiff's back pain and resultant surgery were unrelated to the accident.

10

Dkt. No. 11 at ECF p. 2-3.

Plaintiff asserts her claim for bad faith pursuant to 42 Pa. Cons. Stat. Ann. § 8371, which provides a statutory remedy for the bad faith handling of insurance claims by an insurer. To prevail on her claim, plaintiff "must show that the defendant did not have a reasonable basis for denying benefits under the policy and that the defendant knew or recklessly disregarded its lack of reasonable basis for denying the claim." Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (citations omitted); see also Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2005) (adopting the definition of bad faith set forth by the Superior Court in Terletsky). "Bad faith conduct also includes lack of good faith investigation into facts, and failure to communicate with the claimant." Johnson v. Progressive Ins. Co., 987 A.2d 781, 784 (Pa. Super. Ct. 2009), citing Condio v. Erie Ins. Exchg., 899 A.2d 1136, 1142 (Pa. Super. Ct. 2006). "[M]ere negligence or bad judgment is not bad faith." Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. Ct. 2004). Bad faith must be proven by clear and convincing evidence. Terletsky, 649 A.2d at 688. "The 'clear and convincing' standard requires a showing by the plaintiff[ ] that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant[ ] acted in bad faith." Bostick v. ITT Hartford Grp., Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999) (citations omitted). "Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured." Condio, 899 A.2d at 1143.

After a review of the facts before me on defendant's motion for summary judgment, I find that no reasonable fact finder could find that plaintiff has proven defendant's bad faith by clear and convincing evidence.

**I.    Minor Impact**

First, I find that based on the information available to her about plaintiff's accident, Friel made a reasonable conclusion that it was likely a "minor impact" accident. Defendant "need not show that the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusion. Rather, an insurance company simply must show that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." Mann v. UNUM Life Ins. Co. of Am., No. 02-1346, 2003 WL 22917545, at *7 (E.D. Pa. Nov. 25, 2003) (citation omitted). Although Friel did not obtain photos of the involved vehicles until January 26, 2010, Dkt. No. 12 at ¶ 13, the police report for the accident described "no damage" to the vehicle driven by plaintiff at the time of the accident. Dkt. No. 10 at ¶ 2. Also, Friel had access to plaintiff's recorded statement, in which plaintiff reported that "originally when EMS arrived they did not want to take her to [the emergency room] because they said minor damages to [the vehicle] did not warrant a trip to [the] ER." Dkt. No. 16 at Richardson 1045. At her statement under oath, plaintiff reiterated that, although she ultimately did go to the hospital, the emergency medical responders "were not going to take me to the hospital because they were saying that they didn't see anything wrong, that there was no reason that they should have to transport me to the hospital" and that they "were saying that there was no damage to the vehicle." Dkt. No. 12-13 at 62:22-63:23; see also id. at 67:10-11 ("They took me to Montgomery County Hospital."); id. at 67:25-68-10 (noting that the EMTs did not administer an IV or stabilize her head during the ambulance ride). Plaintiff has not set forth clear and convincing evidence to support a finding that Friel did not have a reasonable basis for her conclusion that the motor vehicle collision was a low impact collision.

## II. Timing of Plaintiff's IME

Second, I find that any delays in scheduling plaintiff's IME are not clear and convincing evidence of defendant's bad-faith pre-judgment of plaintiff's claim. Plaintiff contends that defendant's bad faith is illustrated by defendant's having waited two years to schedule plaintiff for an IME "[d]espite being well-aware that the entire claim ultimately revolved around down to a medical causation issue as to whether Plaintiff's back surgery, two subsequent surgical revisions, and the placement of a spinal cord stimulator, were related to the October 18, 200[6] motor vehicle collision." Dkt. No. 15 at ECF p. 13. I disagree.

Plaintiff has not pointed to clear and convincing evidence that defendant's delay in scheduling plaintiff's IME was so unreasonable that it would amount to bad faith. Defendant "continued its investigation in an objectively reasonable manner, even if it did not move as quickly as [plaintiff] would have liked. No evidence suggests dilatory conduct, dishonesty, obfuscation, or malice." Rossi v. Progressive Ins., 813 F. Supp. 2d 643, 653 (M.D. Pa. 2011). see also Williams v. Hartford Cas. Ins. Co., 83 F. Supp. 2d 567, 572 (E.D. Pa. 2000), aff'd, 261 F.3d 495 (3d Cir. 2001) (holding that the plaintiff's "claim warranted further investigation by [the defendant] and the time [the defendant] took in completing each aspect of its investigation was not so lengthy that [the defendant's] actions amounted to recklessness").

Further, the evidence before me demonstrates that plaintiff's UIM counsel was also partly responsible for any delay in defendant's scheduling of plaintiff's IME because he did not promptly supply defendant with plaintiff's complete records. See, e.g., Dkt. No. 16 at Richardson 1039 (noting that Friel had not received plaintiff's employment records as of May 14, 2008); id. at Richardson 1038 (noting that as of June 25, 2008, plaintiff's UIM counsel was "still not cooperative in providing [Friel with] his client's employment records); id. at

13

Richardson 1036-37 (noting that plaintiff's UIM counsel had not turned over plaintiff's work records as of December 11, 2008); id. at Richardson 1025 (noting "requested records presently outstanding" as of September 15, 2009). Allegations of delay prior to conducting a statement under oath and an IME do not establish clear and convincing evidence of bad faith where such delay may be attributed both to delays by a plaintiff in providing a defendant with relevant medical records and the need for further investigation of a plaintiff's injuries based on those records. See Thomer v. Allstate, 790 F. Supp. 2d 360, 371-73 (E.D. Pa. 2011) (finding no clear and convincing evidence of bad faith where a delay in seeking the plaintiff's statement under oath and IME were at least partly attributable to the plaintiff's delay in providing the defendant with her medical records and there was a "need for further investigation" as the plaintiff submitted additional medical records); see also Brown v. Great Northern Ins. Co., No. 07-0322, 2009 WL 453218, at *6 (M.D. Pa. Feb. 23, 2009) (finding no bad faith where "Plaintiff's own actions prevented a . . . thorough investigation and valuation of his UIM claim").

### III. Causation and Plaintiff's Pre-Existing Medical History

Finally, I find that defendant's evaluation of plaintiff's claim based on its review of available evidence about the cause of plaintiff's claimed injuries is not clear and convincing evidence of bad faith. Plaintiff argues that defendants ignored medical records supporting her position on causation. Dkt. No. 15 at ECF p. 14-18. I disagree. "The underlying facts involve nothing more than a normal dispute between an insured and insurer over the value of a UIM claim." Johnson v. Progressive Ins. Co., 987 A.2d 781, 785 (Pa. Super. Ct. 2009). "[A]n insurance company's substantial and thorough investigation of an insurance claim, which forms the basis of its refusal to make or continue making benefit payments, establishes a reasonable basis that defeats a bad faith claim." Wedemeyer v. U.S. Life Ins. Co. in City of N.Y., No. 05-

14

6263, 2007 WL 710290, at *9 (E.D. Pa. Mar. 6 2007) (citations omitted). The type of plaintiff's pre- and post-accident injuries and the available information about the significance of the motor vehicle collision "provided a reasonable basis for [defendant] to require further information in the form of medical reports, an IME and a sworn statement." Quaciari v. Allstate Ins. Co., 998 F. Supp. 578, 583 (E.D. Pa. 1998).

In Johnson, the plaintiff claimed UIM benefits and provided his insurer with a report from a doctor which stated that plaintiff sustained permanent impairment of his knee function as a result of a motor vehicle accident. Id. at 782. The doctor who conducted an IME at the insurance company's request opined that the plaintiff's knee injuries from the accident had fully resolved and that plaintiff's knee symptoms were unrelated to the accident. Id. at 783. The plaintiff demanded the uninsured motorist policy limit of $100,000. Id. The insurer offered $30,000. Id. At arbitration, the plaintiff was awarded $75,000. The plaintiff filed a bad faith claim against the insurer, who prevailed on summary judgment. Id. The Superior Court affirmed the trial court's decision on summary judgment noting that the parties' dispute "centered upon the measure of damages" and was of a type that "occurs routinely in the processing of an insurance claim." Id. at 785. The Superior Court noted that although the insurance company's "offer happened to be lower than the eventual award . . . bad faith is not present when an insurer makes a low but reasonable estimate of an insured's damages." Id.

Here, as in Johnson, defendants faced evidence in the record that raised a question about the causation of plaintiff's injuries when evaluating her UIM claim. Dr. Lee's June 22, 2006 pre-accident report described plaintiff's pre-existing "leg pain with a disc herniation" as "potentially surgical." Dkt. No. 10 at ¶ 34. After the accident, however, Dr. Goldberg reported that plaintiff "had several epidural steroid injections" prior to the accident "and did not need

15

surgical intervention." Dkt. No. 12-18 at ECF p. 3. Also after the accident, Dr. Lee wrote that plaintiff had gotten "rid of most of her pain and was doing well" prior to the accident. Dkt. No. 12-19 at ECF p. 2. Twelve days after the accident, Dr. Robinson also concluded that plaintiff had "been doing well with interventional therapy for management of her chronic lumbar radiculopathy" prior to the accident. Dkt. No. 12-17 at ECF p. 2. Despite her doctors' post-accident characterizations of plaintiff's status prior to the accident, her November 2006 post-accident MRI showed "no change in the appearance of the disc herniation at the L5-S1 level on the right" when compared to plaintiff's June 2006 pre-accident MRI of her spine. Dkt. No. 10 at ¶ 25. Also, plaintiff was restricted to light duty work immediately prior to and at the time of the accident. Id. at ¶ 26. Accordingly, defendant requested plaintiff's complete medical records, her statement under oath and an IME and ultimately relied on the opinion of the independent physician that there was not "sufficient information to show that this minor impact [accident] was the cause of [plaintiff's] disc surgery and ongoing problems." Id. at ¶ 50.

> [D]efendants were under no obligation to accept [the determinations of plaintiff's treating physicians] at face value to evaluate [plaintiff's] claim in good faith. Rather, to recover under a bad faith claim, [plaintiff] must show that [defendants] did not have a reasonable basis for denying benefits under the policy and recklessly disregarded its lack of a reasonable basis.

Mann v. UNUM Life Ins. Co. of Am., No. 02-1346, 2003 WL 22917545, at * 9 (E.D. Pa. Nov. 25, 2003), citing Terletsky, 649 A.3d at 688. Plaintiff has not shown that, based on the facts now before me, a jury could find by clear and convincing evidence that defendants' denial of her claim was unreasonable. I will therefore grant defendant's motion for summary judgment.

An appropriate Order follows.